UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| JIMMY ANTHONY COX, SR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) NO. 2:20-cv-00081 |
| | ) |
| JOHN DRAPER, ET AL., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

Jimmy Anthony Cox, Sr., an inmate at the Jackson County Jail in Gainesboro, Tennessee, has filed a pro se complaint for violation of civil rights under 42 U.S.C. § 1983. (Doc. No. 1). After his original application for leave to proceed in forma pauperis (IFP) was denied (see Doc. No. 6), Plaintiff filed a new application. (Doc. No. 7).

The case is before the Court for ruling on the Plaintiff's new IFP application and initial review pursuant to the Prison Litigation Reform Act (PLRA), 28 U.S.C. §§ 1915(e)(2) and 1915A, and 42 U.S.C. § 1997e.

### I. APPLICATION TO PROCEED IFP

Under the PLRA, 28 U.S.C. § 1915(a), a prisoner bringing a civil action may apply for permission to file suit without prepaying the filing fee required by 28 U.S.C. § 1914(a). Because Plaintiff's IFP application complies with the statutory requirements and demonstrates that he lacks the funds to pay the entire filing fee in advance, that application (Doc. No. 7) will be granted by separate Order.

## II. INITIAL REVIEW

### A. PLRA Screening Standard

Pursuant to 28 U.S.C. § 1915(e)(2)(B), the Court must dismiss any IFP complaint that is facially frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief. Similarly, Section 1915A provides that the Court shall conduct an initial review of any prisoner complaint against a governmental entity, officer, or employee, and shall dismiss the complaint or any portion thereof if the defects listed in Section 1915(e)(2)(B) are identified. Under both statutes, this initial review of whether the complaint states a claim upon which relief may be granted asks whether it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," such that it would survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). Hill v. Lappin, 630 F.3d 468, 470–71 (6th Cir. 2010) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. Applying this standard, the Court must view the complaint in the light most favorable to Plaintiff and, again, must take all well-pleaded factual allegations as true. Tackett v. M & G Polymers, USA, LLC, 561 F.3d 478, 488 (6th Cir. 2009) (citing Gunasekera v. Irwin, 551 F.3d 461, 466 (6th Cir. 2009) (citations omitted)). Furthermore, pro se pleadings must be liberally construed and "held to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (quoting Estelle v. Gamble, 429 U.S. 97, 106 (1976)). However, pro se litigants are not exempt from the requirements of the Federal Rules of Civil Procedure, Wells v. Brown, 891 F.2d 591, 594 (6th Cir. 1989), nor can the Court "create a claim which [a

plaintiff] has not spelled out in his pleading." Brown v. Matauszak, 415 F. App'x 608, 613 (6th Cir. 2011) (quoting Clark v. Nat'l Travelers Life Ins. Co., 518 F.2d 1167, 1169 (6th Cir. 1975)).

**B. Section 1983 Standard**

Plaintiff seeks to vindicate alleged violations of his federal constitutional rights under 42 U.S.C. § 1983. Section 1983 creates a cause of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws. Wurzelbacher v. Jones-Kelley, 675 F.3d 580, 583 (6th Cir. 2012). Thus, to state a Section 1983 claim, Plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution or laws of the United States, and (2) that the deprivation was caused by a person acting under color of state law. Carl v. Muskegon Cnty., 763 F.3d 592, 595 (6th Cir. 2014).

**C. Allegations and Claims**

The Complaint describes two alleged assaults on Plaintiff by guards in the Jackson County Jail. The first alleged assault took place on July 4, 2020, when Defendant Shane Stanton responded to Plaintiff's inquiry as to why his cell door was locked. During this conversation at the cell door, Plaintiff alleges that Stanton called him a name. In response, Plaintiff confesses that he "did get loud," but was not hitting or kicking at the door. (Doc. No. 1 at 12). Defendant Philip Davis then arrived, and he and Stanton entered Plaintiff's cell. Stanton entered first, and Davis followed with taser drawn. (Id. at 12–13). Plaintiff was ordered to "cuff up," but he replied that he needed to first put his jumpsuit on. (Id. at 13). As soon as Plaintiff put his hands behind his back, Davis left the cell and Stanton applied one handcuff before trying to push Plaintiff into the wall. (Id.) Plaintiff describes the following sequence of events after Stanton pushed him toward the cell wall:

> I then drag[g]ed him outside the cell at which time he jammed the cuff close[d] on my right ring fi[n]ger and cut it and I held my hands behi[nd] my back[.] [H]e fin[al]ly got my cuff on right and then pull[ed] my arms up over my head and started me out the door of green pod and tried to run me into the wall[.] I stop[p]ed him by

3

> putting my foot up and we both went into the wall then I was taken into booking and set on the bench[.] Davis come to[wa]rd me I thought aggress[iv]ely and I slipped my cuffs[1] right the[re] in booking[,] not in [visitation] as the right up (sic) says[.]

(Id. at 13–14). Plaintiff was then asked by Stanton to go to the visitation room "to s[i]t for a while." (Id. at 14.) Stanton closed the visitation-room door behind Plaintiff and the two had another verbal exchange. At that point, Davis sprayed mace under the door "for no reason." (Id.) The officers then briefly left before returning to threaten Plaintiff with another spray of mace under the door, using a can of mace allegedly handed to them by Defendant John Draper. (Id.) Plaintiff was subsequently fed a meal in the visitation room before being taken back to his cell, without going to medical for evaluation of the cut on his hand or his response to the chemical spray. (Id. at 15.)

The second alleged assault took place on July 31, 2020, when an inmate in the cell beside Plaintiff's began kicking the cell door and Davis and Defendant Dustin Durflinger responded, accusing Plaintiff of causing the commotion. (Id. at 18.) Plaintiff states that "we had words," and then Davis ordered him to the back wall of his cell. (Id.) Plaintiff alleges that, as he tried to comply with Davis's order, Davis pulled his can of mace and put it up to the pie flap in the door. Plaintiff then removed his shirt and used it to block the spray but could not keep the spray from hitting him in the side. (Id. at 18–19). He backed up and was then sprayed in the head as well as the lower body. (Id. at 19). Although Plaintiff was wearing pants and thermal underwear, the spray went through his clothing. (Id.) He alleges that Davis "sprayed [him] with so much it pretty much was head [to] toe." (Id.) Davis and Durflinger withdrew from the area and left his pie flap shut, so Plaintiff had to "push [his] button to beg whoever was up in the tower to have them return to get [him] out of the cell." (Id.)

---

[1] It appears that this reference is to Plaintiff "slipp[ing] the cuffs down around his feet bringing the cuffs to the front," according to the incident report attached to the Complaint. (Doc. No. 1 at 16).

4

Davis and Durflinger returned accompanied by Defendant Zachary Rich, and when they opened Plaintiff's cell door, Plaintiff and Davis again "had words" before Plaintiff was taken to the shower for decontamination. (Id. at 20). The shower only briefly worked, so Plaintiff, covered only by a towel, was told to go out into the sally port (which was outdoors and surrounded by a chain link fence) to finish washing the chemical spray residue off his body. (Id.) Durflinger brought the soap out to the sally port, and Rich brought milk for Plaintiff to pour over his private parts. (Id. at 20–21). Plaintiff was then taken to medical, where the irritation caused by the chemical spray was documented on his upper body and his privates. (Id. at 21, 24). Although his reaction to the spray calmed down initially, Plaintiff had to return to medical in the days and weeks that followed for further treatment of the chemical irritation. (Id. at 22).

Plaintiff alleges that his injuries included a cut on his right ring finger and unspecified trouble with his vision after the first assault, and around two months of redness, burning, and swelling to the areas affected by the chemical spray during the second assault, during which time he received "pain meds and other skin care." (Id. at 29). In addition to the Defendants named above, Plaintiff sues Mary Paoletti, an assistant administrator alleged to have been present when the first assault occurred, and Tamorah D. Ryan, the head jail administrator who allegedly "let ass[a]ults go" and would not let Plaintiff file a complaint under the Prison Rape Elimination Act (PREA) "or file one the [right] way." (Id. at 9–10).[2] Among other relief, Plaintiff seeks an award of damages against Defendants in both their individual and official capacities. (Id. at 31).

**D. Analysis**

Plaintiff's allegations evoke a claim of excessive force which, given his status as a state pretrial detainee, arises under the Fourteenth Amendment's Due Process Clause. See Kingsley v.

---

[2] It is not clear from the Complaint whether the incident over which Plaintiff sought to file a PREA complaint was his decontamination while exposed in the sally port.

5

Hendrickson, 576 U.S. 389, 397–98 (2015); Burgess v. Fischer, 735 F.3d 462, 472 (6th Cir. 2013). To prevail on such a claim, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." Kingsley, 576 U.S. at 396–97. The Supreme Court has expressly rejected application in the pretrial detention context of "a subjective standard that takes into account a defendant's state of mind." Id. at 396. The Court has also identified a non-exclusive list of factors that might be relevant to the determination of whether the force used was objectively reasonable: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." Id. at 397.

At this initial stage, and liberally construing the Complaint's allegations in the light most favorable to Plaintiff, he states colorable claims of excessive force arising from both alleged assaults that will be allowed to proceed for further development. Though it is clear that Plaintiff was offering some level of active resistance to Officers Stanton and Davis during the first incident, he alleges that Stanton attempted to push him into a wall prior to securing his handcuffs; roughly applied the cuff to Plaintiff's right hand and injured a finger in the process; and then attempted to run Plaintiff into another wall while he was cuffed behind his back. Then—albeit after Plaintiff had ill-advisedly "slipped his cuffs" to the front in the booking area—Davis is alleged to have sprayed mace under the door to the visitation room where Plaintiff was subsequently restrained, without any apparent need to gain control of him at that point. Plaintiff does not appear to have been seriously injured as a result of these applications of force, and further factual development may vindicate the force used by Stanton and Davis in this first encounter. But especially given the "highly fact-dependent" nature of the inquiry, Coley v. Lucas Cnty., Ohio, 799 F.3d 530, 538 (6th

Cir. 2015), the actions allegedly taken by these Defendants cannot be deemed objectively reasonable at this initial stage of review.

Likewise, Plaintiff states a colorable excessive-force claim with regard to the second alleged assault. He alleges that Davis responded to a disturbance from the cell next to Plaintiff's and, after a verbal exchange, ordered him away from his cell door, brought a can of mace up to the pie flap in the door, and then deployed the mace when Plaintiff moved toward the door, using enough spray that Plaintiff's clothing was penetrated and he had long-lasting effects from the chemical irritation to his upper body and private parts. These allegations are sufficient to establish a nonfrivolous claim that Plaintiff's Fourteenth Amendment rights were violated.

Accordingly, the claims against Defendants Stanton and Davis in their individual capacities will proceed for further development.

The Complaint does not allege that Defendants Draper, Durflinger, Rich, and Paoletti used any force against Plaintiff. At worst, these Defendants are alleged to have been witnesses to Davis's uses or threats of force. But "[p]ersonal involvement is necessary to establish section 1983 liability." Murphy v. Grenier, 406 F. App'x 972, 974 (6th Cir. 2011) (citing Gibson v. Matthews, 926 F.2d 532, 535 (6th Cir. 1991)). The Complaint alleges that Draper "may or may not have [taken] part" in the first assault and that he provided a can of mace used to threaten Plaintiff in the visitation room (Doc. No. 1 at 9, 14), and it merely names Durflinger as a participant in the second assault (id. at 9), without specifying either Defendant's involvement beyond these vague allegations. Defendant Rich is only mentioned as being present when Plaintiff was attempting to decontaminate from the second assault. Because the Court cannot reasonably infer from these allegations that Draper, Durflinger, or Rich are liable for any misconduct, Plaintiff fails to state a plausible claim to relief against these Defendants. Iqbal, 556 U.S. at 678. Similarly, assistant jail

7

administrator Paoletti is alleged in one line of the Complaint to have been present and allowed the second assault to occur (Doc. No. 1 at 28), but her presence is not mentioned in the full description of that encounter (id. at 18–22). While an official may be liable for failing to act to prevent the use of excessive force in certain circumstances, see Batson v. Hoover, 788 F. App'x 1017, 1021 (6th Cir. 2019) (citation omitted), the sparse allegations against Draper, Durflinger, Rich, and Paoletti do not support such a theory of liability here. The claims against them will not be allowed to proceed.

As to the claim against jail administrator Ryan, Plaintiff alleges that she "let ass[a]ults go," that she would not let Plaintiff file a proper PREA complaint, and that she "is the one that has denied me not to be able to get a lot of my legal rights and has [allowed] a lot of the ass[a]ults and things to be done to me." (Doc. No. 1 at 10, 28, 33–34). He alleges that he communicated directly with Ryan about these matters via "time management" because his ability to pursue grievances at the jail was otherwise limited by a system "not fully capable of hand[l]ing the claims." (Id. at 33, 34). Liberally construed, these allegations indicate that Ryan has some level of supervisory responsibility over the other Defendants, does not thoroughly investigate or punish officers' involvement in cases where force is used, and oversees a system that limits the ways in which inmates can report such cases. It is true that a supervisor cannot be held liable simply because she failed to act, or because "she was charged with overseeing a subordinate who violated the constitutional rights of another." Peatross v. City of Memphis, 818 F.3d 233, 241 (6th Cir. 2016) (citing Gregory v. City of Louisville, 444 F.3d 725, 751 (6th Cir. 2006)). But at least for purposes of initial review, Plaintiff plausibly alleges that Ryan's "execution of . . . her job function" was a contributing cause of his injuries because her failure to investigate or punish assaults by jail officers at least implicitly encouraged the allegedly excessive use of force by Stanton and Davis.

See id. at 242. He will therefore be allowed to proceed with his claim against Ryan in her individual capacity.

However, the allegations that Ryan "let ass[a]ults go" and kept Plaintiff from filing a proper PREA complaint, even when liberally construed in Plaintiff's favor, do not support his claim against Ryan in her official capacity. Official-capacity claims "are, in all respects other than name, to be treated as [claims] against the entity" that employs the individual. Foster v. Michigan, 573 F. App'x 377, 390 (6th Cir. 2014) (quoting Kentucky v. Graham, 473 U.S. 159, 165 (1985)). In order to assert a viable claim against Ryan's municipal employer, Jackson County, Plaintiff must allege that his harm was caused by the execution of a policy of custom of the county. Alkire v. Irving, 330 F.3d 802, 815 (6th Cir. 2003). While he does not allege that the harm he suffered resulted from any officially enacted policy of Jackson County, this requirement may also be met by linking the harm to "policies promulgated by the official vested with final policymaking authority for the municipality," Miller v. Calhoun Cnty., 408 F.3d 803, 813 (6th Cir. 2005) (citing Pembaur v. City of Cincinnati, 475 U.S. 469, 482–83 (1986)), or to a custom or practice that "is so widespread as to have the force of law." Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown, 520 U.S. 397, 404 (1997). Although claims of failure to supervise, investigate, and punish jail employees may "rise[ ] to the level of a policy or custom of deliberate indifference" when leveled against a final municipal policymaker, Leach v. Shelby Cnty. Sheriff, 891 F.2d 1241, 1246–47 (6th Cir. 1989), Plaintiff has not alleged that Ryan is such a policymaker, see Shorts v. Bartholomew, 255 F. App'x 46, 52 (6th Cir. 2007) (finding that under Tennessee law, "the Sheriff is the final policymaker over the operation of the jail"), or that she was following a widespread practice within the jail administration of giving insufficient scrutiny to forceful encounters between guards and inmates. See Powell v. Fugate, 364 F. Supp. 3d 709, 729 (E.D. Ky. 2019)

9

(rejecting claim of "unofficial policy of overlooking guards' use of excessive force" based on lack of evidence that the practice was "widespread" or "extended beyond" the jail administrator) (quoting Brown, 520 U.S. at 404). Accordingly, Plaintiff's official-capacity claim against Ryan cannot be allowed to proceed.

Nor may Plaintiff proceed against the remaining Defendants in their official capacities, as he fails to identify any county policy or custom which is causally connected to the injuries alleged in the Complaint. All official-capacity claims will therefore be dismissed from this action.

### III. CONCLUSION

As explained above, the Court finds that the Complaint states nonfrivolous claims against Defendants Stanton, Davis, and Ryan in their individual capacities. These claims will proceed for further development, while all other claims and Defendants will be dismissed.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE

10

Case 2:20-cv-00081   Document 8   Filed 05/18/21   Page 10 of 10 PageID #: 75